VICTOR L. PEARSON and THELMA PEARSON, Appellants, v. KANSAS CITY ICE COMPANY, a Corporation, and WARD B. HYLE, Respondents, No. 41689—234 S. W. (2d) 783.

Division Two, December 11, 1950.

364

[redacted]

*James Patrick Quinn, Alex D. Peebles* and *Quinn & Peebles* for appellants.

*Henry M. Shughart, Harry P. Thomson, Jr.,* and *Shughart & Thomson* for respondents.

[783]  BARRETT, C.—Mr. and Mrs. Victor Lee Pearson instituted this action against the Kansas City Ice Company and its driver to recover damages for the wrongful death of their son, Victor, Junior. Upon the trial of the action a jury returned a verdict for the defendants and the plaintiffs have appealed and assign as error the giving of the defendants' sole cause instruction.  The defendants contend, however, that there is no evidence to support the hypothesis of the plaintiffs' humanitarian submission and, therefore, any error in their instruction is immaterial.

The circumstances of the fatality, in general, were these: On August 7th, 1947, Victor who was then twelve years old, and his playmate, George Pearson, also twelve years old, were riding their bicycles north on Broadway, in Kansas City, between 25th and 26th Streets.  They had left a filling station at 2543 Broadway and Victor was riding ahead of George, ten to fifteen feet.  Four or five car lengths north of the filling station, near 2529 Broadway, automobiles were parked along the east curb of Broadway and Victor was riding about three feet out from the line of parked cars.  The ice truck, a 1926 American-La France, driven by Mr. Hyle, who was then more than seventy years old, and as we understand, who had driven the truck since 1926, turned on Broadway

at 26th Street and proceeded north at a speed, according to him, of ten, twelve, not to exceed fifteen miles an hour. Victor's father was an iceman and Victor knew Mr. Hyle. As the truck and the bicycles traveled north Victor turned or looked back over his shoulder and waved to Mr. Hyle and his bicycle handle bar hit the left rear fender of the third parked car, a Willys, and he was thrown into the street, about five and one half feet from the parked car, and the truck ran over him. The witnesses of both parties testified to these facts and there is no dispute concerning them.

The plaintiffs' humanitarian case was submitted upon the hypothesis of Victor's imminent peril and specifically that Mr. Hyle thereafter could "have turned said vehicle to the left and to have stopped the [784] same and thereby have prevented the truck from striking and injuring Victor." The defendants say, as is the fact, that the time which must be considered in determining whether the truck could have been stopped or so swerved as to avoid the casualty "is limited to the period between the time when the bicycle struck the parked automobile and the moment at which the boy contacted the truck." And, the defendants point to certain evidence and urge that even under the most favorable view a finding that the truck could have stopped or sufficiently swerved in that period would be based on mere conjecture and speculation. It is insisted that there is no evidence as to how far the truck could have been swerved and nothing to show how far west on Broadway Victor was thrown. It is also argued that the plaintiffs' case as to certain distances, if accepted, is based upon split seconds, and in any event, it is urged that Mr. Hyle did all that was possible in the circumstances and that there is no substantial evidence that the truck could have been stopped or swerved so as to avoid the fatality after Victor's imminent peril arose. It was the defendants' contention that the true facts of the occurrence were, and their evidence supported the contention, that Victor was not ahead of the truck but was even with the right side of the truck's cab when the bicycle hit the parked automobile, that he was not hit by the front wheel of the truck but was thrown under the truck and run over by the rear wheel only. And, of course, under that version of the occurrence there was not time and space in which to stop or swerve the truck and avoid hitting the boy. Likewise, even if Victor was ahead of the truck and was hit by the front wheel, there could be no humanitarian case if he was then so close to it that there was neither time nor space in which to stop or swerve after Victor's bicycle hit the parked car and he was thrown into the path of the truck. That was, in effect, the situation in Dipaoli v. Langemann, (Mo. App.) 192 S. W. (2) 35, in which there was a defendant's verdict. There a boy stopped at a street intersection astride his bicycle and, after looking, proceeded across the

intersection and his rear wheel was hit by an eastbound automobile. There the defendant's speed was twenty miles an hour and the boy was but eleven feet away when the defendant first saw him. Likewise, in Yeaman v. Storms, 358 Mo. 774, 217 S. W. (2) 495, the speed of ten miles an hour and the distance of ten feet permitted a zone of peril in time of but two-thirds of a second. And in Danzo v. Humfeld, (Mo.) 180 S. W. (2) 722, when a truck hit a pedestrian, the court summarized the situation by saying: "But no evidence was introduced from which it could be inferred that the driver of the Humfeld truck saw, or in the exercise of the highest degree of care could have seen, plaintiff (and his demeanor) prior to the instant plaintiff emerged from in front of the Coca-Cola truck." But that is not the situation here and the difficulty with the defendants' position is that the evidence upon which they rely is the defendants' evidence and it ignores or compels a rejection of the plaintiffs' evidence which is not contrary to the physical facts or so incredible as to compel rejection. Here the evidence conflicts as it did in Koebel v. Tieman Coal & Material Co., 337 Mo. 561, 85 S. W. (2) 519, as to whether a truck hit a bicycle, some witnesses said it did and some said it did not, hence it was for the jury to decide. The bicycle cases are collected in the annotation 172 A. L. R. 786.

In the first place, there were other general facts bearing upon the specific question. Broadway is forty-two feet wide and, according to the plaintiffs' evidence, there was no southbound traffic and no traffic from the north near the truck. The parked Willys automobile was six to seven feet wide and Victor was traveling about three feet out from the parked car and was thrown about five and one half feet into the street from the parked car. A policeman measured the distance from the east curb of Broadway to the right-hand wheels of the truck and he said that the distance was twelve feet seven inches. Since the parked Willys was six to seven feet wide and Victor was thrown about five and one half feet into the street from the Willys, it is a reasonable inference that he was thrown into the path of the truck. The [785] truck left skid marks upon the pavement and the policeman said that these marks did not swerve or turn but ran in a straight line for a distance of ten feet.

The boys had been in the filling station at 2543 Broadway to get a drink and had been playing with the water fountain. Donald Krampe, who operated the filling station, said that he was standing in the island of his gasoline pumps and watched the boys as they proceeded north down the street. Because his evidence is the crux of the plaintiffs' case, the salient parts of it follow. He said that the boys stopped at the end of the filling station driveway, "got in a little powwow there and started on down the street" north,

Victor ahead of George, and he was looking at them and at the truck and saw the truck hit the boy. He saw the bicycle hit the parked car. "He was waving at the truck driver, the boy that had the accident. * * * His bicycle, the handle-bar hit the car, spun him in and spun him out in the street, he fell in the street. * * * Well, now, sir, he fell as flat as a man could fall. Q. Did you see him move any after that? A. He tried to but he acted like he was sort 'of stunned or something, he didn't move as fast as he should. Q. *At the time that he struck the pavement where was this ice truck? A. Well, again as I stated I am not too good on distances but I would say about two truck lengths behind where this boy had the accident there.* Q. By two truck lengths are you referring to this particular truck? A. Yes, sir. * * * Q. What in your judgment is the length of that ice truck? A. Well, just offhand I couldn't exactly tell you, I would say through my experience in automobiles it would be anywhere from twenty to twenty-one feet anyhow. That is an extra large truck they had, extra large ice truck. Q. At the time you say the truck was about two truck lengths back of the place where the boy was lying on the pavement was the truck moving in a northerly direction? A. Yes, sir. Q. At what speed was the truck traveling? A. Not very fast, sir. Q. What in your judgment? A. *I have seen that truck go by numbers of times, by my place of business and if he was going fifteen miles an hour he was going fast, that is, just about fifteen, between ten and fifteen miles an hour.* Q. On this particular occasion you say what was the speed? A. *I would say between ten and fifteen miles an hour.* Q. *From the time the boy struck the pavement and from where the car was as you have stated did the car change its course any?* A. *No, sir.* Q. It went directly in a northerly direction? A. Yes."

On cross-examination these pertinent questions were asked and these relevant answers given: "Q. Now, can you tell us from that place on the island how far north of you did the accident happen? * * * A. Roughly 300 feet. * * * The boy that was killed was in front on his bicycle, the other boy I would say was about ten or fifteen feet behind him. * * * Q. How near were they to the parked cars parked at the east curb? * * * A. *Well, they were, I would say, three feet away from the cars on the outside of the street side of the cars.* * * * Q. Those parked cars began about five car lengths north of your driveway? That is right? A. Yes, sir, as near as I can judge by that, they were that far, yes, sir. * * * Q. Will you tell the jury how you saw the accident when you were standing fifteen feet in from the curb line? A. I took specific interest in these two boys as they went down the street, from my island you could see practically to the Phillips 66 station without getting off of my island right on

the side of the cars. * * * He started up, he started to get up to get out — Q. He got up on both knees, did he? A. On his hands and knees like this (indicating). Q. You saw that? A. Yes, sir. [786] Q. *Then the truck hit him?* A. *The truck was behind him coming down.* Q. You saw the boy on the street there. Where was he with reference to the parked car? How far out from the parked car? A. Where was he? Q. The boy on the street when he fell? A. *I would say five and a half feet from the car that he had hit.* * * * Q. *His head faced the east,* his feet then to the west? A. Yes, sir. Q. *Five or six feet out from the parked cars?* A. *Yes.* Q. *Then you saw the truck run over him?* A. *Yes.* Q. *What part of the truck hit him?* A. *The front wheel hit him and he rolled. When he rolled the back did the damage.* Q. Did the front wheels go over him? A. Yes, I am sure it did. As near as I could see it, sir, I would say it went over him. * * * Q. *Now, when the boy hit the rear of that fender of this Willy's where do you say the truck was?* A. *I would say it was about a truck and a half behind him.* Q. A truck and a half behind him. That is your best judgment? A. Yes, sir. *. * * Q. Was there any traffic between where the accident occurred and where you were standing? A. No, sir. * * * Q. You say you are a pretty poor judge of distance? A. Not too poor, no. If you come to pinning me down to the exact figures I wouldn't hold myself liable for that. Q. You say you are a fairly good judge of distance? A. If I take the average car to be anywhere from twelve to fourteen feet, yes, sir. * * * Q. How far out from the parked cars was the truck running? A. In its regular channel. I would say a distance of four to five feet, I would say about six feet."

This is the essential part of Krampe's evidence and in some phases of it he is corroborated by the fair inferences of the defendants' evidence, even by Mr. Hyle's testimony. Mr. Hyle said that his speed was ten to twelve miles an hour, not over fifteen. He had seen the boys earlier in the day and after he turned onto Broadway he saw the parked cars and he saw the boys on their bicycles going north on Broadway and they were ahead of him, even though it is his testimony that he overtook them and that Victor did not wave and fall until he was about even with the fender. When asked by this counsel in what distance he stopped the truck he said: "Oh, I judge twenty-eight or thirty feet." On cross-examination the following questions were asked and these answers given: "Q. Well, now, from the time you started to stop until the time you brought your truck to a stop, *understand me, from the time your mind said to your foot let's stop until you brought your truck to a full stop you traveled only about ten feet, didn't you?* A. *Well, skidded ten feet.* * * * Q. *Mr. Hyle, you did*

*bring your truck to a stop in ten feet after you started to stop the truck?* A. *I wouldn't say it skid ten feet, I would say it stopped in .twenty-eight or thirty feet from start to finish."* Mr. Hyle had previously given plaintiffs' counsel a statement and in that statement he told them that the boys were about 150 feet north of the corner of 26th and Broadway when he turned left on Broadway. Among other things, he said: "When the boy waved at me he was from twelve to fifteen yards in front of my truck."

He says he did not read the statement and it may be. disregarded for the purposes of this opinion but nevertheless the fair inferences, favorable to the plaintiffs, from the quoted evidence demonstrate a submissible humanitarian case. The only testimony as to the length of the truck was that of Krampe who said it was twenty-one feet long. If the bicycle was two truck lengths ahead of the truck when it hit the parked car and Victor fell five and one half feet to the left of the seven foot parked Willys into the street, the truck was then forty-two feet away. If the bicycle was but a truck's length and a half ahead of the truck the distance was at least thirty-one feet. In either case Mr. Hyle admitted that he actually stopped the [787] truck "in twenty-eight or thirty feet from start to finish" and there is and can be no doubt that he saw the boy and the bicycle before and at the moment it hit the parked car. As to his ability to swerve the truck the situation is epitomized in Steger v. Meehan, (Mo.) 63 S. W. (2) 109, 110, "If an automobile can be driven (at 25 miles per hour) 75 feet in two seconds, surely it can be swerved 3 or 4 feet to one side in that time to avoid striking a pedestrian 2 feet from the curb. If it can be brought to a complete stop in 20 feet, surely it can be slowed down enough in much less than that distance to allow a pedestrian, in such a position, to escape it." See also Webb v. Cox, (Mo. App.) 53 S. W. (2) 1057, a bicycle-automobile case. It is demonstrable mathematically, from the evidence favorable to the plaintiffs, that the truck could have stopped if the circumstances of the occurrence were as the plaintiffs' witnesses described them. By way of illustration that a humanitarian case was made and to contrast the cases upon which the defendants rely see Radabaugh v. Williford, 342 Mo. 528, 116· S. W. (2) 118; Levins v. Vigne, (Mo.) 98 S. W. (2) 737 and Dickens v. Heitzman, (Mo. App.) 141 S. W. (2) 183. In the Radabaugh case a father and his eight year old son came from between angle parked cars and the boy was hit by an automobile. The court summarized the case in this language, 116 S. W. (2), l. c. 119: "Defendant stopped his automobile within a distance of 15 feet. It traveled approximately 40 feet (at a speed of 15 miles an hour) without changing its course or stopping after Loren was within defendant's range of vision.

Defendant could or should have observed Mr. Radabaugh's unsuccessful effort to protect Loren from defendant's oncoming automobile, and Loren's failure to attempt to remove himself from its path. The court correctly overruled defendant's general demurrer at the close of all the evidence.'' In the Dickens case a drunk man was staggering in the street. The defendant first saw the deceased when he was fifty feet away traveling at a speed of twenty-five miles an hour and at that speed could stop in thirty feet and it was held that the evidence made a submissible humanitarian case.

Against the plaintiffs' hypothesis of the defendants' liability under the humanitarian doctrine the court gave, on behalf of the defendants, the following sole cause instruction:

''The Court instructs the jury that if you find and believe from the evidence in this case that the defendants or either of them were not negligent in any respect set forth in Instruction #1, which directly caused or directly contributed to cause the injuries in evidence sustained by Victor Lee Pearson, Jr. mentioned in evidence, and if you find and believe from the evidence that the said Victor Lee Pearson, Jr. mentioned in evidence failed to keep a reasonably careful or vigilant lookout for traffic and the parked automobile mentioned in evidence and was thereby negligent, if you so find, and if you find and believe from all the evidence that the aforesubmitted failure, if any, of the said Victor Lee Pearson, Jr. to keep a reasonably careful or vigilant lookout, if so, was the direct and sole cause of the collision in evidence, if so, and the injuries sustained by the said Victor Lee Pearson, Jr., if so, then your verdict must be in favor of the defendants.''

The appellant-plaintiffs insist that the instruction is prejudicially erroneous in that there is no evidentiary basis for it, that it does not sufficiently and properly hypothesize the facts, fails to negative negligence on the part of the defendants and injects into consideration antecedent negligence of the deceased. Under the defendants' version of the occurrence there was an evidentiary basis for the instruction (Dipaoli v. Langemann, (Mo. App.) 192 S. W. (2) 35) and in our view, the only question necessary to a determination of the appeal is whether the instruction sufficiently and properly hypothesized the factual situation. It will be observed that the only *facts* hypothesized are that *''said Victor Lee Pearson, Jr. mentioned in evidence failed to keep a reasonably careful or vigilant lookout for traffic and the parked automobile mentioned in evidence.''* As the defendants urge a similar instruction was approved in Bashkow v. McBride, (Mo. App.) 177 S. W. (2) 637. However, the instruction in the Bashkow case did refer to ''the time and place mentioned in the evidence'' [788] as this one does not. Likewise, the approved instruction in Jants v. St. Louis Public Service Co., 356 Mo. 985, 204

S. W. (2) 698, referred to "the time and place mentioned in the evidence" and to speed "under the circumstances," and otherwise hypothesized the *facts* of the situation. The instruction in the Bashkow case could not be approved today as a sufficient factual hypothesization of a sole cause situation exonerating the defendants of liability as against a humanitarian factual submission of ability to stop or swerve. The defendants attempt to distinguish Janssens v. Thompson, 360 Mo. 351, 228 S. W. (2) 743 (en banc) by saying that the real vice of the instruction under consideration there was that it was "so general that it might have misled the jury into considering the plaintiff's contributory negligence as a defense under a humanitarian submission." They say that the failure to watch in that instruction was not limited by the instructions or evidence to any particular point and covered a substantial period of time, and distance. But in that case the sole cause submission was "the negligence, if any, of their said son in failing to look or listen for the approach of a train, if he did so fail, or in failing to stop the truck he was driving before the collision with the train." The court indicated how the issue could have been properly submitted and, in doing so, said: "Surely it is no more difficult to make such a hypothesization of these facts, under which the humanitarian rule could not apply, than it is to hypothesize the essential facts of most specific negligence cases." The court did discuss antecedent negligence in disapproving the instruction but the plain implication of the opinion is that the instruction was lacking in its failure to properly hypothesize the facts of the defendant's sole cause evidence and defense. The court said: "If, 'sole cause' is not an affirmative defense * * * then it must require a converse finding to the plaintiff's theory of the case. Therefore, the defendant can either submit the exact converse of plaintiff's humanitarian submission, or of any essential element thereof, or he can submit facts (shown by his evidence) which would disprove one or more of the basic facts of plaintiff's humanitarian submission. If the defendant chooses to submit facts (shown by his evidence and different from plaintiff's version) they must have the legal effect of showing that there could have been no humanitarian negligence on his part. Otherwise they could not disprove any basic fact of the humanitarian rule." The instruction here falls in this latter category and is subject to the vices the court was discussing. Plainly, the case holds that "the negligence, if any, of their said son in failing to look or listen for the approach of a train, if he did so fail, or in failing to stop the truck he was driving before the collision with the train" was an erroneous factual submission of the defendant's hypothesis of sole cause as against the plaintiff's humanitarian submission. The instruction involved here, except for failure to stop, is substantially similar to the instruction in the Janssens case

and contains the same inherent defects. Furthermore, if the instructions in Long v. Mild, 347 Mo. 1002, 149 S. W. (2) 853 and Bootee v. Kansas City Public Serv. Co., 353 Mo. 716, 183 S. W. (2) 892 are erroneous for lack of a sufficient factual hypothesization of sole cause, it follows as of course that the instruction here is likewise erroneous. Also, on the factual submission of the primary assignment of speed, see Yates v. Manchester, 358 Mo. 894, 217 S. W. (2) 541 and Dahlen v. Wright, 361 Mo. 524, 235 S. W. (2) 366. The giving of instruction six on sole cause was prejudicially erroneous and the judgment is therefore reversed and the cause remanded.

*Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. *Tipton* and *Leedy, JJ.,* concur; *Ellison, P. J.,* dubitante as to submissible case; concurs as to sole cause instruction in separate concurring opinion filed.

[789] ELLISON, P. J., concurring—I am doubtful on the holding of the principal opinion that plaintiffs made a case for the jury on the issue whether the truck driver could have saved the boy after the latter's bicycle suddenly struck a parked automobile and threw him into the street in the path of the approaching truck. One witness estimated the truck was then about 1-½ or 2 truck lengths away, an estimated distance of 31 to 42 feet. This witness said the truck was traveling 10-15 miles per hour. The truck driver said the same. And he said he stopped the truck in 28-30 feet. Before he fell the boy was waving at the truck driver, whom he knew, thus diverting the latter's attention. Certainly it is a case where reaction time was a very important element. I concur in the ruling of the opinion on the sole cause instruction.